UNITED STATES of America, Plaintiff,

and

South Carolina Department of Health and Environmental Control, Plaintiff-Intervenor,

v.

SOUTH CAROLINA RECYCLING AND DISPOSAL, INC.; Columbia Organic Chemical Company; Oscar Seidenberg; Harvey Hutchinson; Monsanto Company; Allied Corporation; Aquair Corporation; Eaton Corporation; and EM Industries, Inc., Defendants,

v.

G.D. SEARLE & CO., and Will Ross, Inc., Third-Party Defendants.

Civ. A. No. 80–1274–6.

United States District Court, D. South Carolina, Columbia Division.

Order Feb. 23, 1984.

Findings of Facts Aug. 28, 1984.

Order on Motion for Summary Judgment Nov. 22, 1985.

Order of Dismissal Dec. 19, 1985.

Order on Third-Party Claim Dec. 23, 1985.

Final Order Aug. 14, 1986.

F. Henry Habicht, II, Angus Macbeth, Deputy Asst. Atty. Gen., Carol E. Dinkins, Asst. Atty. Gen., Land & Natural Resources Div., Dept. of Justice, Douglas I. Greenhaus, Office of Enforcement, U.S. Environmental Protection Agency, Mary G. Slocum, Asst. U.S. Atty., Quentin C. Pair, Scott C. Fulton, Attorney, Hazardous Waste Section, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., Craig Campbell, Attorney, Enforcement Div., Environmental Protection Agency, Atlanta, Ga., Robert Homiak, U.S. Environment Act. Agency, James J. Kohanek, Office of Hazardous Waste Protection Agency, Washington, D.C., for plaintiff.

Isadore S. Bernstein, Hammer & Bernstein, Columbia, S.C., for Columbia Organic Chemical Co. and Oscar Seidenberg.

Reece Williams, Columbia, S.C., for S.C. Recycling and Disposal, Inc.

Travis Medlock, Atty. Gen., Richard P. Wilson, Asst. Atty. Gen., Walton J. McLeod, III, General Counsel, Dennis N. Cannon, Jr., Staff Atty., Cola., S.C., for S.C. Dept. of Health and Environment Control.

Edward W. Warren, P.C., L. Mark Wine, David G. Norrell, Frank B. Cross, Kirkland & Ellis, Washington, D.C., for Chemical Manufacturers Assoc. (amicus curiae); David F. Zoll, Richard G. Stoll, Chemical Manufacturers Assoc., Washington, D.C., of counsel.

Claude M. Scarborough, Jr., Cola., S.C., for Monsanto Co. and E.M. Industries.

Hugh B. Campbell, Jr., Charlotte, N.C., for Aquair Corp.

Robert E. Stepp, Cola., S.C., and Robert W. Dibble, Robert T. Bockman, Martin B. Helfant, Morristown, N.J., for Allied Corp.

H. Simmons Tate, Jr. and Tom Gottsha, Cola., S.C., for G.D. Searle & Co. and Will Ross, Inc.

Phocion S. Park, Brent J. Gilhousen, Monsanto Co., St. Louis, Mo., for Monsanto Co.

Thomas J. Stephens, White Plains, N.Y., for E.M. Industries.

## ORDER

SIMONS, District Judge.

## INTRODUCTION

This action was instituted by plaintiff United States pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607, to recover costs of removing hazardous substances from the surface of the Bluff Road site, a hazardous waste site located near Columbia, South Carolina. Named as defendants in this action are four hazardous waste "generators", the two owners of the Bluff Road property, a lessee of at least a portion of the site, and the site operator.

Plaintiff United States has filed for partial summary judgment on the issue of each defendant's joint and several liability for costs incurred in responding to the hazardous conditions posed by the site. The generator defendants have likewise filed motions for summary judgment against plaintiff, as has Columbia Organic Chemical Company ("COCC"), a lessee of at least a portion of the site.[1]

■ The Federal Rules of Civil Procedure provide, in pertinent part, that summary judgment

> shall be rendered forthwith if in the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c). The Rules also allow that summary judgment "may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." *Id.* While "any doubt as to the

---

1. A factual dispute exists regarding whether COCC leased all of the Bluff Road site or only a portion thereof, as well as whether COCC was ever involved in hazardous waste disposal or storage activities.

existence of a genuine issue of fact is to be resolved against the moving party," *Wessinger v. Southern Ry. Co., Inc.*, 438 F.Supp. 1256, 1259 (D.S.C.1977), the function of Rule 56 is not to preserve purely speculative issues of fact for trial. *Atlantic States Construction Co. v. Robert E. Lee & Co.*, 406 F.2d 827 (4th Cir.1969). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see if there is a genuine need for trial." *Id.* at 829. Furthermore, summary judgment is not to be denied merely because the pleadings create the appearance of a dispute. *Watson v. Southern Ry. Co.*, 420 F.Supp. 483 (D.S.C.1975), *aff'd*, 542 F.2d 1170 (4th Cir.1976). Rather, "if in essence there is no real dispute as to the salient facts," the goal of the court is

> to smoke out if there is any case, i.e., any genuine issue as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

*Bland v. Norfolk & Southern Ry. Co.*, 406 F.2d 863, 866 (4th Cir.1969).

Reviewing the record in a light most favorable to the parties opposing the various motions, this court concludes that there are no material issues of fact in dispute other than the nature of COCC's business activities and the terms of its lease of the Bluff Road site. Thus, based on the undisputed facts, the court determines that the summary judgment motions of the defendants should be denied. The court further concludes that summary judgment should be granted in favor of the plaintiff against all defendants except COCC on the issue of those defendants' joint and several liability under CERCLA for costs incurred by the government in cleaning up the surface of the Bluff Road site.

## THE UNDISPUTED FACTS

The undisputed facts established in the record can be summarized as follows. In 1972, Max G. Gergel, President of COCC, negotiated a verbal lease of at least a part of the Bluff Road site, a four acre piece of property located along Bluff Road near Columbia, South Carolina, on behalf of COCC with the property owners, Oscar Seidenberg ("Seidenberg") and Harvey Hutchison ("Hutchison"). COCC purportedly planned to use its leasehold for storage of raw chemicals and materials used in its manufacturing processes. COCC continued to lease at least a part of the property from the owners until 1978.

In late 1973 or early 1974, several individuals associated with COCC—James Q.A. McClure, Max Gergel, and Henry Tischler—began storing hazardous wastes, including hazardous substances, at the Bluff Road site as part of a waste brokering and recycling operation. In 1976, the three individuals incorporated South Carolina Recycling and Disposal Inc. ("SCRDI") and thereafter continued hazardous waste operations at the site under auspices of the corporation. SCRDI occupied part of the site from the years 1976 to 1978, and it assumed the verbal lease in 1978.

During the course of operations at the site by SCRDI and its predecessors, an environmental hazard of staggering proportions developed. Some 7,200 fifty-five gallon drums of hazardous substances, including materials which are toxic, carcinogenic, mutagenic, explosive, and highly flammable, accumulated at the site. The drums were randomly and haphazardly stacked upon one another without regard to their source or the compatibility of the substances within. Many drums deteriorated to the point that their hazardous contents were leaking and oozing onto the ground and onto other drums. The exposure of these substances to the elements, as well as to other substances with which they comingled, caused a number of fires and explosions and generated noxious and toxic fumes.

Given the extremity of conditions at the site, the United States Environmental Protection Agency ("EPA") determined that the storage and disposal of hazardous substances there had resulted in releases and threatened releases of hazardous sub-

stances into the environment. EPA endeavored to remedy the hazardous conditions. An agreement was reached with twelve waste generators and one transporter associated with the site to perform 75% of the surface removal work at the site. The South Carolina Department of Health and Environmental Control ("DHEC") and several agencies of the federal government, also generators of some of the wastes at the Bluff Road site, have agreed as well to contribute funds to remedial activities at the site. Money from the Hazardous Substance Response Trust Fund established under CERCLA was used to finance the cleanup of the remaining 25% of the site's surface. Plaintiff seeks to recover costs associated with the second phase of the cleanup in this action.

The generator defendants—AquAir Corporation ("AquAir"), Allied Corporation ("Allied"), Monsanto Company ("Monsanto"), and EM Industries, Inc. ("EM")—are companies that arranged with SCRDI and its predecessors for treatment or disposal of hazardous substances. Drums belonging to each of these defendants were observed at the site during and before cleanup of the site. Moreover, hazardous substances of the same type found in each of these defendant's wastes were identified in samples taken at the site during cleanup operations.

## DEFENDANTS' LIABILITY UNDER CERCLA § 107

■ In Section 107(a)(1)–(4) of CERCLA, 42 U.S.C. § 9607(a)(1)–(4), Congress established a liability classification scheme which identifies four classes of defendants and describes the connection to a given waste site necessary for each to be held liable for response costs resulting from the

release or threat of release of hazardous substances at the site. Once the requisite nexus is established, each class is strictly liable [2] *unless* they can prove that, under the defenses enumerated in CERCLA Section 107(b)(1)–(4), the release or threat of release of hazardous substances was caused solely by unrelated persons or events. Applying Section 107(a) to the undisputed facts, each defendant is clearly liable.

### A. *Liability of Generator Defendants*

Section 107(a) of CERCLA provides in part that

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

. . . . .

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances ... from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan....

42 U.S.C. § 9607(a).

■ Stripping away the excess language of the statute, a generator may be held liable under Section 107(a)(3) of CERCLA if the government can prove that:

**2.** The standard of liability provided for in Section 107 is undoubtedly strict liability. *See, e.g., United States v. Price,* 577 F.Supp. 1103, 19 E.R.C. 1638, 1647 (D.N.J.1983); *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1148 (E.D.Pa.1982); *United States v. Royal N. Hardage,* No. CIV 80–1031–W, Findings of Fact and Conclusions of Law (W.D.Okla. December 13, 1982), 13 ERL 20189. Apart from the express language of the provision, the definitional

section of CERCLA, 42 U.S.C. § 9601(32), makes it clear that the standard of liability that obtains under CERCLA is the same as the standard under Section 311 of the Clean Water Act, 33 U.S.C. § 1321. That section clearly imposes strict liability. *See, e.g., United States v. Bear Marine Services,* 509 F.Supp. 710 (E.D.La.1980), *rem'd on other grounds,* 696 F.2d 1117 (5th Cir.1983); *United States v. Tex Tow,* 589 F.2d 1310 (7th Cir.1978).

a. The generator's hazardous substances were, at some point in the past, shipped to a facility;

b. The generator's hazardous substances or hazardous substances *like* those of the generator were present at the site;

c. There was a release or threatened release of *a* or *any* hazardous substance at the site;

d. The release or threatened release causes the incurrence of response costs. Under CERCLA's express terms, plaintiff need prove nothing more. *See United States v. Wade*, 577 F.Supp. 1326 (E.D.Pa. 1983).

■ Generator defendants would nonetheless have this court require plaintiff to prove that hazardous substances traceable to each generator were released at the Bluff Road site or that their specific substances were more than a *de minimis* factor in a release or threatened release. Significantly, similar "causation" arguments were recently expressly rejected by the Eastern District of Pennsylvania in *United States v. Wade, supra,* a case on all fours factually with this one.

In *Wade,* the court held that to require specific proof of causation would not only be at odds with the express language of

the statute,[3] but also would effectively "eviscerate the statute" because of the technological infeasibility of "fingerprinting" a given generator's substances at a site. *Id.* at 1332. In support of its conclusion, the court noted that Congress considered and rejected language imposing liability on "any person who caused or contributed to the release"[4] in favor of CERCLA's present liability classification scheme, which clearly does not include comparable language. *Id.* at 1333. Concluding that Congress had not intended to saddle the government with an impossible causation burden, the court held that "[t]he only required nexus between the defendant and the site is that the defendant have dumped his waste there and that the hazardous substances found in the defendant's waste are also found at the site." *Id.* at 1333.

■ This court agrees with the conclusions reached in *Wade* and therefore rejects defendants' causation arguments. Plaintiff's burden of proof is defined by and limited to the express terms of the statute.[5] Applying those terms to the undisputed facts, it is clear that each of the generator defendants made arrangements with SCRDI or its predecessors for disposal or treatment of wastes containing hazardous substances and that, as evidenced

---

**3.** The generator defendants in *Wade,* like the generator defendants in this case, read CERCLA Section 107(a)(3) to require a showing that a generator's substances were shipped to a site and that there was a release or threatened release of *such* hazardous substances. The statute, however, requires only that there be a release or threatened release of *a* or *any* hazardous substance at the site.

**4.** The Court was referring to H.R. 7020, 96th Cong., 2d Sess., § 3071(a)(1), 126 Cong.Rec. at H9459 (daily ed. Sept. 23, 1980) and Senate Staff Working Paper #1 on S. 1480: Senate Comm. on Envir. and Pub. Works, 96th Cong., 2d Sess. § 4(a) (February 1, 1980), reprinted in A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Senate Comm. on Envir. and Pub. Works, S.Doc. No. 97–14, 96th Cong., 2d Sess. (1983).

Notably, provisions of CERCLA's legislative history cited by generator defendants for the proposition that specific causation must be

shown under Section 107(a)(3) relate either to the original causation language in H.R. 7020 or to a personal injury remedy that was also dropped from the Act. These provisions are, therefore, unpersuasive.

**5.** The statute takes into account the synergistic potential of improperly managed hazardous substances and essentially presumes a contributory "causal" relationship between each of the hazardous substances disposed of at a site and the hazardous conditions existing at the site. This presumption may be rebutted under Section 107(b) of CERCLA if a defendant can show that the conditions at the site were caused solely by a person unrelated contractually to that defendant. While some of the defendants stated Section 107(b) defenses in their answers, none of them have supported that defense by way of affidavits or otherwise. Under summary judgment procedure, a party "may not rest upon the mere allegations or denials of his pleading but ..., by affidavits or otherwise provided in this rule, must set forth specific facts showing that is a genuine issue for trial." Fed.R.Civ.P. 56(e).

by the identification of each generator's drums at the Bluff Road site, such wastes were shipped to the site. It is further undisputed that hazardous substances like those of each of the generator defendants were present at the site at the time of cleanup, as shown by samples taken at the site;[6] that there were releases and threatened releases of hazardous substances at the site; and that the government incurred costs in responding to those releases and threatened releases. Thus, based on the undisputed facts, each of these generator defendants is subject to liability under Section 107 of CERCLA.

### B. *Liability of the Landowners*

■ Under Section 107(a)(2) of CERCLA, "any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of" and at which there has been a release or threatened release of hazardous substances, is liable for response costs incurred at the site. 42 U.S.C. § 9607(a)(2). The landowners Hutchinson and Seidenberg do not dispute their ownership of the Bluff Road property or that hazardous substances were disposed on the property during their period of ownership. They also have not disputed that there were releases and threatened releases of hazardous substances at the site which caused the incurrence of response costs. Consequently, there are no material issues with respect to these defendants' liability.

■ In this connection, the court notes that after the summary judgment hearing, the landowners sought to amend their Answer, which the court permitted with plaintiff's consent. The landowners urge that

their Answer, as amended, raises disputed issues of fact concerning the affirmative defense to liability provided by 42 U.S.C. § 9607(b)(3). The court does not agree that the amended Answer and the landowners' affidavits raise such genuine issues of fact. The § 9607(b)(3) defense would require the landowners to prove *inter alia* that "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused *solely* by ... (3) an act or omission of a third party other than ... one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly with the defendant...." (emphasis added). Because there is no question of the contractual link between the landowners and SCRDI, whose liability is admitted, the landowners cannot under any circumstances prove that the release was caused "solely" by a third party which did not share a contractual relationship with them. Thus, because the § 9607(b)(3) defense is unavailable to them from the outset, the landowners cannot rely on disputed factual issues concerning its other requirements to bar the summary judgment against them.

### C. *Liability of SCRDI*

SCRDI has not contested any facts material to its liability as operator of the Bluff Road site. Furthermore, SCRDI's counsel consented to the entry of summary judgment against SCRDI at oral argument on this matter.

### D. *Liability of COCC*

■ COCC has attempted to show a factual dispute with respect to its responsibility for the Bluff Road site by way of affidavits written in July of 1980 by its Presi-

---

**6.** This court does not mean to suggest that because the government was able to show by way of chemical analysis in this case that each generator's substances or substances like those of each generator were at the site, it must undertake extensive sampling and analysis in performing cleanups. As the government pointed out in its affidavits, it would have cost in the range of $2.5 million to attempt through analytical means to identify all waste types in the conglomerate of materials stored at the Bluff

Road site, approximately five times the cost of surface removal itself. Less resource exhaustive means of showing that a generator's waste or similar wastes are at a site, such as by identification of a generator's drum at the site during cleanup or by way of documentary or circumstantial proof that the wastes were hauled to the site absent proof that they were subsequently taken away, should also be sufficient to satisfy this element of proof.

dent, Steven Reichlyn and its former President, Max Gergel. Portions of both affidavits state that COCC was never involved in hazardous waste disposal or storage activities. The Reichlyn affidavit further suggests that COCC leased only a fraction of the Bluff Road site from the landowners.

Plaintiff has moved to strike these assertions in the affidavits, arguing that they fail to raise a genuine issue of fact because they are grossly inconsistent with the rest of the record in the case. Plaintiff further contends that the statements in the Reichlyn affidavit are not based on personal knowledge.

While the court recognizes that other aspects of the record sharply conflict with the affidavits offered by COCC, it concludes that such credibility determinations should be made at trial, and not on a motion for summary judgment.

## JOINT AND SEVERAL LIABILITY OF DEFENDANTS

■ Having determined that each of the defendants except, at this point, COCC, are liable for response costs under Section 107(a) of CERCLA, the extent of their liability must now be determined. Several courts have recently addressed this issue and have reached the conclusion that joint and several liability is appropriate under CERCLA in circumstances of indivisible injury. *See, e.g., United States v. Wade, supra,* at 1337–1338; *United States v. Chem-Dyne,* 572 F.Supp. 802 (S.D.Ohio 1983). This court finds particularly persuasive the conclusions reached in the *Chem-Dyne* decision and adopts the analysis and standard employed by the court in that case.[7] In *Chem-Dyne,* the court made the following conclusions:

This case, as do most pollution cases, turns on the issue of whether the harm ... is "divisible" or "indivisible." If the harm is divisible *and* there is a reasonable basis for apportionment of damages, each defendant is liable only for the portion of the harm he himself caused.... In this situation, the burden of proof as to apportionment is upon each defendant.... On the other hand, if the defendants caused an entire indivisible harm, each is subject to liability for the entire harm.

*Id.* at 811 (citations omitted and emphasis added). Under the *Chem-Dyne* standard, this court's initial focus should be on whether the harm at the Bluff Road site was divisible, an issue upon which defendants bear the burden of proof. If the harm was indivisible, the court's inquiry is complete for purposes of this action.

■ This court concludes that, based on undisputed facts, the harm at the Bluff Road site was indivisible. Because of the deleterious condition of the site at the time of cleanup, it is impossible to divide the harm in any meaningful way. There were thousands of corroded, leaking drums at the site not segregated by source or waste type. Unknown, incompatible materials comingled to cause fires, fumes, and explosions. Because of the constant threat of further fires, explosions, and other reactions, all of the materials at the site were, if not actually oozing out, in danger of being released. Thus, while all of the substances at the site contributed synergistically to the threatening condition at the site, it is impossible to ascertain the degree of relative contribution of each substance. Clearly, the harm was indivisible, and defendants have failed to meet their burden of proving otherwise.

---

**7.** After this court's bench ruling on the issue of each defendants' joint and several liability under CERCLA § 107, an opinion was rendered by the Southern District of Illinois, in *United States v. A & F Materials Company, Inc.,* 578 F.Supp. 1249 (1984), on the same issue. The *A & F* decision could be considered at odds in some respects with the *Chem-Dyne* decision. This court finds the *Chem-Dyne* decision more in

keeping with Congress' intention that evolving and traditional principles of common law and prior statutory law govern the courts' imposition of joint and several liability under CERCLA and, accordingly, follows the analysis employed in that case. I reject the analysis of *A & F* to the extent that it is inconsistent with Chief Judge Rubin's opinion in *Chem-Dyne.*

Generator defendants have argued that there may be a means of roughly apportioning the costs of cleanup among responsible parties by calculating their relative volumetric contributions from shipping documents, and that, therefore, the harm is divisible. But, as noted by the court in *Chem-Dyne*, "the volume of waste of a particular generator is not an accurate predictor of the risk associated with the waste because the toxicity or migratory potential of a particular hazardous substance generally varies independently of the volume." *Chem-Dyne, supra,* at 811. Such arbitrary or theoretical means of *cost* apportionment do not diminish the indivisibility of the underlying harm, and are matters more appropriately considered in an action for contribution between responsible parties after plaintiff has been made whole.[8] Because the harm at the Bluff Road site is indivisible, each defendant against whom summary judgment is granted is jointly and severally liable for costs incurred at the site.

## CONSTITUTIONAL ISSUES

Environmental statutes like CERCLA which regulate and adjust the benefits and burdens of economic life come before the Court with a strong presumption of constitutionality. *Duke Power Co. v. Car-olina Environmental Study Group, Inc.,* 438 U.S. 59, 83–84, 98 S.Ct. 2620, 2635–2636, 57 L.Ed.2d 595 (1978). The generator defendants in this case nevertheless urge this court to find that liability under CERCLA is unconstitutionally retroactive and, further, that CERCLA violates the Contract Clause of the United States Constitution. These arguments are without force.

Defendant's Contract Clause argument is particularly transparent. Article I, § 10 of the Constitution provides that "[n]o *State* shall ... pass any ... law impairing the obligation of contracts." (Emphasis added). Thus, by its express terms, the Contract Clause applies only to State legislation, not federal laws like CERCLA. *See Allied Structural Steel Company v. Spannaus,* 438 U.S. 234, 257, 98 S.Ct. 2716, 2728, 57 L.Ed.2d 727 (1978), *reh. den.* 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201; *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935), *reh. den.,* 296 U.S. 661, 56 S.Ct. 82, 80 L.Ed. 471; *Hanover National Bank v. Moyses,* 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902). Moreover, even if the Contract Clause were construed to apply to CERCLA, the Act has not operated substantially to impair these defendants' waste

---

**8.** For some recent applications of this principle, see *In the Matter of the Complaint of Berkley Curtis Bay Co.,* 557 F.Supp. 335 (S.D.N.Y.1983) (although it was theoretically possible to apportion responsibility for an oil spill between two defendants 65%–35%, joint and several liability was nonetheless imposed); *City of Perth Amboy v. Madison Industries, Inc.,* Sup.Ct. cf. N.J. Appellate Div., A–1127–81T3 and A1276–81T3 (Consolidated) (April 21, 1983) (two waste generators held jointly and severally liable for contaminating a pond even though one of the generator's substances contaminated only the pond water and the other generator's substances contaminated only the pond sediments); *State of New York v. Schenectady Chemicals, Inc.,* Reuselaer Co. Index No. 144654 (N.Y.Sup.Ct. Feb. 18, 1983) (joint and several liability could be imposed even though volumetric contributions of defendants were known).

As noted in the Restatement (Second) of Torts, "[i]n recent years the trend, both of legislation and of decisions in absence of it, has been toward recognition of the right of contribution; and a substantial majority of states now grant contribution." § 886A, Comment (a). See, *Edmonds v. Compagnie Generale Transatlantique* 443 U.S. 256, 260 n. 8, 99 S.Ct. 2753, 2756 n. 8, 61 L.Ed.2d 521 (1979) (citing § 886A of the Restatement). Such evolving principles of common law were intended by Congress to guide the courts in fleshing out CERCLA's liability provisions. *Chem-Dyne, supra,* at 808. Under the Restatement, questions of determining "equitable shares of the liability" with respect to an indivisible injury are appropriately resolved in an action for contribution after plaintiff has been made whole. See Restatement § 886A(1) and (2). Notably, Section 107(e)(2) of CERCLA permits actions in contribution among parties held jointly and severally liable. *Chem-Dyne, supra,* at 807 n. 3; 126 Cong.Rec. H. 11,788 (daily ed. Dec. 3, 1980) (opinion of Assistant Attorney General read into record by Rep. Florio). Making plaintiff, the Fund, whole in the first instance allows costs expended at the Bluff Road site to be recouped quickly and applied to other hazardous waste problems.

disposal contracts with SCRDI. To the contrary, the contracts remain valid and enforceable between the parties. There is nothing to prevent a generator defendant held liable here from seeking indemnity from SCRDI under their contract.

■ While somewhat more substantial, defendants' argument that CERCLA is so impermissibly retroactive that it violates due process also fails. Although liability under CERCLA is premised in part upon conduct which occurred prior to CERCLA's enactment in 1980, this court does not consider CERCLA "retroactive" in the constitutional sense as applied to the facts of this case. The plain language of Section 107 of CERCLA makes it quite clear that CERCLA is a broad remedial statute premised upon *present and future effects* of defendants' past actions—a "release" or a "threatened release" of a hazardous substance must occur before any liability attaches. A statute that attaches liability to present conditions stemming from past acts does not necessarily have retroactive effects that are subject to due process limitations.[9] As noted by the Supreme Court in *Reynolds v. United States*, 292 U.S. 443, 54 S.Ct. 800, 78 L.Ed. 1353 (1934), "A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." *Id.* at 449, 54 S.Ct. at 803.

Recent decisions under Section 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, a statutory provision analogous to Section 107 of CERCLA, are persuasive on this point. Section 7003 authorizes the United States to bring suit to secure such relief as is necessary to abate an imminent and substantial endangerment to health or the environment caused by hazardous wastes. Courts interpreting Section 7003 have held that it is not "retroactive" in nature because its objective is to obtain relief to abate current and future hazardous conditions, notwithstanding the fact that the conditions might be attributable to past acts. See *United States v. Price*, 523 F.Supp. 1055, 1071–1072 (D.N.J.1981), *aff'd*, 688 F.2d 204 (3d Cir.1982); *United States v. Diamond Shamrock Corporation*, C.A. No. 80–1857, 17 E.R.C. 1329 (N.D. Ohio, May 29, 1981). As stated in *United States v. Price*,

> Defendants ... observe that Section 7003 was not adopted and did not become effective until 1976, and they argue that the statute was not meant to apply retroactively to acts that preceded that date. Hence, because the dumping of toxic wastes at Price's Landfill ceased in 1972, defendants argue that the statute cannot be used to impose liability on them. We find this argument unpersuasive.... The gravamen of a Section 7003 action, as we have construed it, is not defendants' dumping practices, which admittedly ceased with respect to toxic wastes in 1972, but *the present imminent hazard* posed by the continuing disposal (*i.e.,* leaking) *of contaminants into the groundwater.* Thus, the statute neither punishes past wrongdoing nor imposes liability for past acts. Rather, as defendants themselves argue, its orientation is essentially prospective. When construed in this matter, *the statute simply is not retroactive. It merely relates to current and future conditions.*

9. See *Chicago & Alton Railroad Company v. Tranbarger*, 238 U.S. 67, 73, 76, 35 S.Ct. 678, 680, 681, 59 L.Ed. 204 (1915) (statute requiring bridge culvert does not apply retroactively to railroad which built bridge without culvert three months before statute enacted; railroad subject to liability because "after that time [enactment of the statute] it maintained the embankment in a manner prohibited"); *City of Bakersfield v. Miller*, 64 Cal.2d 93, 48 Cal.Rptr. 889, 895, 410 P.2d 393, 399, *cert. denied*, 384 U.S. 988, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966), (building constructed in accordance with existing building codes ordered modified pursuant to revised code which was enacted "to eliminate presently existing public danger"); *Reynolds v. United States*, 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934); *United States v. Jacobs*, 306 U.S. 363, 367, 59 S.Ct. 551, 553, 83 L.Ed. 763 (1939); *Lewis v. Fidelity & Deposit Co. of Maryland*, 292 U.S. 559, 571, 54 S.Ct. 848, 853, 78 L.Ed. 1425 (1934); *Cox v. Hart*, 260 U.S. 427, 435, 43 S.Ct. 154, 157, 67 L.Ed. 332 (1922).

*Id.* (Emphasis added). See also *Commonwealth v. Barnes & Tucker Co.*, 23 Pa. Cmwlth. 496, 319 A.2d 871, 884 (Pa.Sup.Ct. 1974) 472 Pa. 115, 371 A.2d 461, (holding that a law requiring the abatement of present conditions constituting a public nuisance stemming from past acts is not a "retroactive" law), *appeal dismissed sub nom. Barnes & Tucker Co. v. Pennsylvania*, 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977).

■ Thus, it is this court's view that CERCLA is not retroactive as applied in this case. Such a construction avoids a constitutional question and is therefore preferred. *Lorrillard v. Pons*, 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978); *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). It should be noted, however, that even if CERCLA were considered retroactive it would clearly satisfy the requirements of due process.

■ The fact that a statute has retroactive application that may upset settled expectations does not necessarily make it unconstitutional. *Usery v. Turner Elkhorn*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *Fleming v. Rhodes*, 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947). "This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Turner Elkhorn*, 428 U.S. at 16, 96 S.Ct. at 2893; *Lichter v. United States*, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938); *Funkhouser v. Preston Co.*, 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243 (1933). In *Turner Elkhorn*, the leading case on the constitutionality of retroactive statutes, the Supreme Court made clear the standard to be employed in the instant case: in the area of economic regulation, legislation that operates retroactively does not violate due process if it is rationally related to a valid Congressional purpose. 428 U.S. at 15–16, 96 S.Ct. at 2892–93.

In *Turner Elkhorn*, the Supreme Court upheld the Black Lung Act of 1972, 30 U.S.C. § 901, against a challenge that it violated due process because it applied retroactively. The Act required coal mine operators to compensate past and present miners, as well as minors' survivors, for total disability or death due to black lung disease. Notably, miners who left employment before the effective date of the Act were eligible for benefits. The mine operators argued that "to impose liability upon them for former employees' disabilities is impermissibly to charge them with an unexpected liability for past, completed acts that were legally proper and, at least, in part, unknown to be dangerous at the time." 428 U.S. at 15, 96 S.Ct. at 2892. Rejecting the operators' challenge to the statute, the Court noted that

> It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Id.* These principles, the Court elaborated, apply to retrospective, as well as prospective, legislation:

> [O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability on past acts.

*Id.* at 16, 96 S.Ct. at 2893 (citations omitted). The Court concluded that Congress had acted rationally in enacting the Black Lung Act:

> [T]he imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers.

*Id.* at 18, 96 S.Ct. at 2893.

To the extent that CERCLA is considered retroactive, it clearly satisfies the *Turner Elkhorn* standard. Like the statute at issue in *Turner Elkhorn*, CERCLA was enacted in response to the threat perceived by

Congress to be caused by inactive and abandoned hazardous waste sites, a problem described as the most serious health and environmental problem of the decade. *See* S.Rep. No. 96–848, 96th Cong., 2d Sess. 2 (1980). As with the Black Lung Act, Congress· intended through CERCLA to create a broad remedial statute which allocates to those persons responsible for creating dangerous conditions, and who profited from such activities, the true costs of their enterprise. An overriding objective in enacting CERCLA to spread the economic costs of cleanup operations among "those responsible for any damage, environmental harm, or injury [resulting from] chemical poisons...." S.Rep. No. 96–848, 96th Cong., 2d Sess. 12 (1980).[10]

■■■■■ The liability scheme established under CERCLA is clearly a rational means of achieving this objective. Whether some other approach to spread these costs would have been wiser or more practical is not a question of constitutional dimensions but is rather a policy question which must be left to the Congress and not to the courts. *Turner Elkhorn*, 428 U.S. at 19, 96 S.Ct. at 2894. Having recognized a rational relationship between Congress' goals and the means chosen to implement them, this

court concludes that, if considered retroactive, CERCLA is not unconstitutionally retroactive.[11]

## TIMELINESS OF ACTION

■■■ As a final matter, several of the defendants have urged that because the government had not yet incurred all response costs associated with surface removal activities at the Bluff Road site at the time its amended complaint was filed, and Section 107(a) of CERCLA limits the government's recovery to costs "incurred," plaintiff's action was prematurely instituted. As a practical matter, this issue is now moot, since surface removal activities at the site were completed in July of 1983. In any event, the government need not have incurred all costs related to a site before initiating a cost recovery action under Section 107(a) of CERCLA. See *United States v. Wade, supra*, at 1334–1335; *United States v. A & F Materials, supra*, at 1258–1259.

## CONCLUSION

In summary, each of the defendants falls within one of the classes of persons identified in Section 107(a) of CERCLA as liable

---

10. Similarly, as the Seventh ·Circuit noted in commenting on cost allocation under Section 311 of the Clean Water Act:

 [T]he party engaged in the potentially polluting enterprise is in the best position to estimate the risk of accidental pollution and plan accordingly as by raising its prices or purchasing insurance. Economically, it makes sense to place the cost of pollution on the enterprise (here water transport of gasoline) which statistically will cause pollution and in fact does cause pollution.

 *United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1314–15 (7th Cir.1978).

11. The fact that some of the defendants held liable here have also contributed to the Hazardous Substance Response· Trust Fund does not diminish CERCLA's rationality. To require the industry generically responsible for hazardous waste problems to contribute to a fund which bears the costs of cleaning up sites where viable responsible parties cannot be found, while at the same time holding individual companies liable for costs associated with specific sites to which they have contributed wastes, appears imminently rational.

This court also finds unpersuasive generator defendants' argument that the "irrebuttable causal presumption" embodied in Section 107(a) is unconstitutionally rigorous under the analysis employed by the Supreme Court in *Turner Elkhorn*. First, the presumption of contributory causation in Section 107(a) is not irrebuttable because a defendant may prove under Section 107(b) that the harm at a site was caused solely by persons or events unrelated to itself. Moreover, the presumption embodied in Section § 107 appears to be far less tenuous than the causal presumptions upheld by the Supreme Court in *Turner Elkhorn*. To be constitutional, "it is only essential that there be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." *Turner Elkhorn*, 428 U.S. at 28, 96 S.Ct. at 2898. The rebuttable presumption that hazardous substances present at poorly managed hazardous waste sites contribute ·causally to the overall hazardous and threatening conditions at such sites is neither arbitrary nor irrational, and, therefore, satisfies due process.

for response costs associated with the Bluff Road site. Because the harm at the site was indivisible, their liability is joint and several. Therefore, this court, finding no constitutional impediments to its conclusions, denies defendants' motions and grants summary judgment in favor of plaintiff on the issue of the joint and several liability of each defendant except COCC for surface removal costs incurred by plaintiff at the Bluff Road site. Summary judgment against COCC is denied. The liability of COCC and the amount of recovery to which plaintiff is entitled will be resolved in subsequent proceedings.

AND IT IS SO ORDERED.

## ON LIABILITY

### STATEMENT OF THE CASE

This action was brought by the United States of America to recover costs incurred in removing hazardous substances from the surface of a site located along Bluff Road near Columbia, South Carolina (hereafter "the Bluff Road site"). Named as defendants in the case were four hazardous waste generators, the two current property owners, the operator of the site—South Carolina Recycling and Disposal, Inc. (hereafter "SCRDI"), and Columbia Organic Chemical Company (hereafter "COCC"). In an order dated February 23, 1984, this court granted summary judgment against all defendants, except COCC, on the issue of their joint and several liability for the government's cleanup costs under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (hereafter "CERCLA"), 42 U.S.C. § 9607(a). Because there appeared to be a factual dispute with respect to COCC's involvement at the Bluff Road site, plaintiff's motion against COCC was denied and trial

was set on the outstanding issue of COCC's liability. Proceedings to determine the amount of plaintiff's recovery from liable defendants will be set for a later date.

As a result of the summary judgment proceedings, the issues with respect to COCC's liability have been substantially narrowed. It was established within the context of those proceedings that hazardous substances were disposed of at the Bluff Road site during the years 1972 to 1983 and that there were releases and threatened releases of hazardous substances into the environment from the site. Thus, succinctly stated, the question presently before this court is whether COCC was sufficiently related to the hazardous waste disposal activities at the Bluff Road site to subject the company to liability under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for response costs incurred in cleaning up the site's surface. Plaintiff contends that COCC is liable under CERCLA as a site "owner" and as an "operator" under Section 107(a)(2), as a person who arranged for disposal of hazardous substances under Section 107(a)(3), and as a "transporter" under Section 107(a)(4).[1] This court agrees.

### FINDINGS OF FACT

In a trial without jury on March 19–21, 1984, the court made the following findings of fact:

1. Plaintiff is the United States of America, acting on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), and the defendant is COCC, a South Carolina corporation.

2. The subject of this litigation is a hazardous waste storage and disposal facility

---

**1.** The complaint does not include a count against COCC under Section 107(a)(4). Nevertheless, plaintiff presented proof at trial relating to COCC's liability under that provision without objection by COCC. Rule 15(b) of the Federal Rules of Civil Procedure provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had

been raised in the pleadings.... [F]ailure [to move] to amend does not affect the result of the trial of these issues." Because COCC did not object to plaintiff's evidence on the issue of COCC liability under Section 107(a)(4), COCC impliedly consented to trial on this issue, and this court may treat the issue as though it had been raised in the pleadings.

(the "Bluff Road site"), located along South Carolina State Road 48 ("Bluff Road") near Columbia, South Carolina. The Bluff Road site is approximately four acres in size.

3. COCC is a corporation engaged primarily in the manufacture of chemicals. COCC's offices and main manufacturing facility are located at 912 Drake Street in Columbia, South Carolina (hereafter the "Cedar Terrace plant"). The company was founded in 1944 by Max Gergel, who served as its president until July 26, 1977, and as its Chairman of the Board until approximately 1978. Gergel was the chief executive officer of COCC and had substantial authority over the operations of the company. During his presidency, Gergel and the Board of Directors did not always adhere to COCC's by-laws.

4. In or around late 1972, Max Gergel, by oral agreement with the owners of the property, leased the Bluff Road site on behalf of COCC, initially for the purpose of storing chemicals used in COCC's manufacturing processes. COCC maintained a month-to-month leasehold interest in the site from 1972 through August of 1978.

5. In approximately late 1973, James O.A. McClure and COCC entered into a business relationship for the purpose of reclaiming and recycling saleable materials from the waste products of other concerns. Pursuant to their arrangement, McClure solicited potential customers on behalf of and in conjunction with COCC. McClure discussed the potential offers with Gergel, who could veto any transactions that he believed were not beneficial to COCC's new enterprise. Initially, Gergel often confirmed McClure's offers to potential customers under his own signature on COCC stationary.

6. Approximately 150 fifty-five gallon drums of waste chemicals and hazardous substances gradually accumulated at the parking lot for COCC's Cedar Terrace plant during this early period. Because this storage activity was using too much space at the Cedar Terrace plant, it was decided that the Bluff Road property, which COCC was using at that time to store chemicals used in its manufacturing processes, could be used for such storage. After investigating the site's facilities and physical layout, McClure arranged for the transfer of the waste materials from COCC's parking lot to the Bluff Road property.

7. The business relationship between COCC and McClure was formalized on July 26, 1974 in a written contract signed by Gergel on behalf of COCC and by McClure. Pursuant to the contract, McClure located materials and customers and negotiated contracts with customers for the purchase, sale, recycling and/or disposal of industrial chemical wastes; COCC provided office space, secretarial service, and approved McClure's contracts. Gergel did, at times, refuse to approve a prospective contract, but he approved the vast majority of McClure's proposals. McClure paid COCC $50.00 a month for the rental of the Bluff Road site, where waste chemicals and hazardous substances procured pursuant to the contract were stored. Net profits were divided fifty-fifty between COCC and McClure.

8. Sometime during the first half of 1974, Gergel appointed McClure as a vice president of COCC. He was put in charge of a new division of COCC which was, with Gergel's approval, named the Solvents and Bulk Chemicals Division. McClure purchased 10 shares of COCC stock in 1974 and regularly attended shareholder's meetings. In early 1976, he was elected to the Board of Directors on an interim basis, and in August of that year he was elected as a permanent member. COCC officers and directors, as well as COCC shareholders, were aware that McClure was acting as a vice president of COCC. COCC correspondence in which McClure was represented as a vice president of the company included memoranda to board members, officers, and shareholders, as well as external communications to the South Carolina Department of Health and Environmental Control, the Bankruptcy Court, Western Union, potential customers, and the public at large. Copies of external correspondence on

COCC stationary signed by McClure as vice president of COCC, were, at one time or another, given to Gergel, Reichlyn, and various other corporate officers. McClure made reports concerning the activities of his division at numerous shareholders and directors meetings. No one at COCC, including members of the Board of Directors, officers, and shareholders, ever took action to prevent McClure from representing himself as a vice president or agent of COCC.

9. As part of its recycling, reclamation, and disposal enterprise, and with its own trucks or trailers, COCC transported chemical and industrial waste materials of other companies to the Bluff Road site. For the benefit of the enterprise, McClure, representing himself to be a vice president of COCC, obtained a South Carolina Waste Haulers' Permit for exclusive use by COCC. COCC employees were used to pick up waste materials from generating facilities and unload such materials from vehicles at the Bluff Road site. Occasionally, common carriers or a generator's vehicles were used to haul waste to the site.

10. During the period that the Solvents and Bulk Chemicals Division was under McClure's direct supervision the enterprise was profitable for COCC. Through the work of the Division, COCC, using its own trucks, picked up and transported to the Bluff Road site industrial chemical wastes from various companies, including Allied Corporation, General Electric Company, and Arapahoe Chemicals, Inc. These wastes contained such substances as 1,1,1-trichloroethane, acetone, and pyridine, all hazardous wastes listed in 40 C.F.R. § 261.-31, and, accordingly, hazardous substances under Section 101(14) of CERCLA 42 U.S.C. § 9601(14). The wastes also contained cyclohexylamine, a hazardous substance because it exhibits the characteristic of ignitability under 40 C.F.R. § 261.21. Waste which could not be reclaimed, recycled, and sold were stored and disposed of on the Bluff Road site. Payments by customers for these services were made to COCC, not McClure.

11. During the winter of 1974—1975, COCC cleaned up an abandoned hazardous waste site owned by the Southeastern Pollution Control Company (hereafter "SEPCO") and located near Clover, South Carolina. The People's National Bank of Chester, which held the mortgage on the Clover property, paid COCC $3,800 for the cleanup. Three to four COCC employees worked several days a week over a four to six month period to clean up the site. COCC also used its own equipment, including a special forklift, and leased a tractor and flat bed trailers to assist in the operation. COCC took possession of the waste at the Clover site for sale and disposal.

12. COCC transported four to five flatbed truckloads—approximately 400 fifty-five gallon drums—of wastes from the Clover site to the Bluff Road site. Many of these materials had no immediate market value and were contained in decaying drums. McClure was authorized to move these drums to Bluff Road on behalf of COCC, and Gergel had been aware of the possibility of moving the wastes to Bluff Road before the Clover operation was initiated. The drums of chemical waste from Clover were stored on the Bluff Road site, both inside and outside the warehouses located on the property, and remained there, along with unuseable and unsaleable wastes from other generators, until the time of the cleanup.

13. During the Clover cleanup, McClure was able to identify, by their distinctive odor, acetic acid and butyric acid, both hazardous substances listed pursuant to Section 311 of the Clean Water Act and incorporated into CERCLA under Section 101(14). At Bluff Road, McClure again recognized acetic acid and butyric acid amongst the material brought from Clover. The unrebutted testimony of Dr. Eugene Meyer, a government expert qualified in the field of physical chemistry, was that acetic acid and butyric acid are among the few hazardous substances that can be readily identified by their distinctive odor. General testing at the Clover site by COCC also identified chlorinated solvents, acetone, organic and inorganic acids, caustics,

solvents and glycols—all hazardous substances under Section 101(14) of CERCLA.

14. In June of 1976, Gergel, McClure, and Henry Tischler, another vice president of COCC, formed South Carolina Recycling and Disposal, Inc., a defendant previously found jointly and severally liable in this case. This corporation assumed all of the activities of recycling, reclamation, and disposal formerly performed under the auspices of COCC. Gergel, McClure, and Tischler were the sole stockholders and officers of SCRDI. McClure served as President, Tischler as Vice President, and Gergel as Secretary-Treasurer.

15. In July of 1976, SCRDI, by oral agreement, subleased on a month-to-month basis from COCC that portion of the Bluff Road property which COCC was not using to store materials for use in its manufacturing processes. SCRDI paid rent to COCC, which then paid the total rental to the landowners. The sublease continued until August of 1978, when SCRDI assumed the entire leasehold interest and paid the landowners directly.

16. After COCC's primary leasehold interest terminated in 1978, COCC continued to manufacture chemicals, including organo-iodine and organo-bromine compounds, some of which were flammable. COCC used water to clean equipment used in the production of organic compounds. This wastewater was contaminated with such substances as methyl iodide, a volatile organic chemical, and was drummed for disposal. According to the unrebutted testimony of Dr. Meyer, methyl iodide is a member of the class of halomethanes, which are hazardous substances listed pursuant to Section 307 of the Clean Water Act and incorporated into CERCLA under Section 101(14).

17. COCC contracted with SCRDI for disposal of COCC's drummed wastewater at the Bluff Road site during the period of time following termination of COCC's primary leasehold interest in 1978. On occasion during this time frame, COCC itself transported the wastes to the Bluff Road site, where it would dump the materials.

These wastes were not removed from the site prior to the cleanup.

## CONCLUSIONS OF LAW

Section 107(a) of CERCLA provides, in pertinent part, as follows:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

\* \* \* \* \* \*

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan....

42 U.S.C. § 9607(a). At the outset, it must be noted that COCC is a "person" and that the Bluff Road site is a "facility" at which "hazardous substances" were "disposed" and "released," within the broad meanings ascribed those terms in Section 101 of CERCLA. With these preliminary determinations aside, the court will evaluate COCC's liability under the above subsections of Section 107(a).

### 1. *COCC was an "owner" of the Bluff Road facility.*

In 1972, COCC negotiated an oral lease of the Bluff Road site with the owners of

the property. COCC's leasehold interest in the property was continuous from 1972 until the latter part of 1978. During the years 1976 to 1978, COCC, by oral agreement, sublet a portion of the property to SCRDI for its waste disposal and recycling business. Without question, hazardous substances were disposed of at the Bluff Road site during the period of COCC's leasehold.

Apart and distinct from its participation in the operation of the Bluff Road site, COCC, as lessee of the site, maintained control over and responsibility for the use of the property and, essentially, stood in the shoes of the property owners. As evidenced by the definitional provisions of CERCLA, site control is an important consideration in determining who qualifies as an "owner" under Section 107(a). See 42 U.S.C. § 9601(20)(A). Accordingly, site lessees like COCC should, along with the property owners themselves, be considered "owners" for purposes of imposing liability under Section 107(a).[2] To conclude otherwise would frustrate Congress' intent that persons with responsibility for hazardous conditions bear the cost of remedying those conditions. See S.Rep. No. 96–848, 96th Cong., 2d Sess. 13 (1980).

The fact that during part of its leasehold COCC sublet a portion of the site does not diminish its responsibility. If anything, it strengthens the case against COCC. As a general rule, a lessor or sublessor who allows property under his control to be used by another in a manner which endangers third parties or which creates a nuisance, is, along with the lessee or sublessee, liable for the harm. See California v. Watt, 520 F.Supp. 1359 (C.D.Cal. 1981); Daigle v. Continental Oil Co., 277 F.Supp. 875 (W.D.La.1967). See also Restatement (Second) of Property § 18.1; 49 Am.Jur.2d Landlord and Tenant § 898 (1970).

Thus, this court concludes that by virtue of its lessee/sublessor interest in the Bluff Road facility at a time during which hazardous substances were disposed of at the facility, COCC can be held liable as an "owner" pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

### 2. COCC was an operator of the Bluff Road Facility.

There are three separate bases for concluding that, in addition to and apart from being liable as an "owner" of the Bluff Road facility, COCC is liable as an "operator" of the facility. First, COCC was generally involved in the hazardous waste disposal business, as evidenced by COCC's cleanup of the waste disposal site in Clover, South Carolina and subsequent removal of some of the waste materials from that site to the Bluff Road facility.

Second, the evidence leads this court to conclude that from 1974 to 1976, James Q.A. McClure was an employee and servant of COCC—a vice president in charge of the company's Solvents and Bulk Chemicals Division. In his official capacity as vice president, McClure supervised and directed the storage and disposal of hazardous substances at the Bluff Road site. McClure's authority to conduct these activities was either express or implied by virtue of his position as vice president. Moreover, even if these activities were not expressly or implicitly authorized by COCC, McClure clearly had the apparent authority to conduct waste storage and disposal activities. Under the principle of apparent authority, "one who holds out another, *or allows him to appear as having authority to act,* as his agent with respect to his business generally, or with respect to a particular matter, cannot ... deny that his apparent authority is real." *Glens Falls Indemnity Bank Co. v. Palmetto Bank,* 23 F.Supp. 844, 848 (W.D.S.C.1938) (emphasis added).

---

**2.** For cases in other contexts in which the term "owner" has been construed to include leaseholders, see *Hager v. Devils Lake Public School District,* 301 N.W.2d 630 (N.D.1981) (under state constitution, a tenant is entitled to compensation as an "owner"); *Allen v. Hall County,* 156 Ga.App. 629, 275 S.E.2d 713 (1980) (the term "owner" in condemnation statutory provision includes leaseholders); *Elliott v. Joseph,* 163 Tex. 71, 351 S.W.2d 879 (1961) (the term "owner" in condemnation statutory provision includes lessees).

The court in *Glens Falls* made the following observations:

> The public is compelled to rely upon the apparent authority of agents of ... corporations, especially when as managers or superintendents or executives, they are placed in control or in charge of the corporation's business. The fact that one has an office at the principal place of business of the corporation where its actual operations take place, that he apparently is in charge of the office and the work, that he supervises and gives orders to employees, that he opens the letters of the corporation, that he conducts its correspondence, that he signs the checks, handles the bank accounts, the cash, etc. and all the surrounding facts and circumstances may be considered and taken into account regardless of his title, in determining what his apparent authority is.

> \* \* \* \* \* \*

> The apparent scope of an agent's authority is that authority which a reasonably prudent man, induced by the principal's acts or conduct, and in the exercise of reasonable diligence and sound discretion, under similar circumstances with the party dealing with the agent, and with like knowledge, would naturally suppose the agent to have.

*Id.*

In this case, a reasonably prudent man would naturally have concluded that McClure had the authority to conduct hazardous waste activities on behalf of COCC. Here, McClure was given office space and secretarial support by COCC, conducted correspondence relating to hazardous waste activities on COCC stationary, and held himself out to the public, to government agencies, and to potential waste disposal customers as a duly authorized agent of COCC. Because McClure had either the express, implied, or apparent authority to conduct waste storage or disposal activities, COCC is, under the doctrine of *respondeat superior*, bound by his acts and liable under CERCLA for the results of those acts. *E.g., Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir.1970); *Bradley v. Hullander*, 272 S.C. 6, 249 S.E.2d 486 (1978).

Finally, even if McClure was not an authorized official of the corporation, COCC would still be liable as an operator under the theory of joint venture. As a general rule, parties to a joint venture are mutually and vicariously liable for injuries or harms caused by their venture. *Pritchett v. Kimberling Cove Company*, 568 F.2d 570 (8th Cir.1978); *Rowe v. Brooks*, 329 F.2d 35 (4th Cir.1964); *Richardson v. Walsh Construction Company*, 334 F.2d 334 (3d Cir.1964); *Opco, Inc. v. Scott*, 321 F.2d 471 (10th Cir.1963). Application of this rule of liability to public health and safety statutes like CERCLA seems particularly appropriate.

The Fourth Circuit Court of Appeals has defined a joint venture as "a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation...." *Dexter and Carpenter v. Houston*, 20 F.2d 647, 651 (4th Cir.1927). The Circuit Court has since elaborated that "[a] joint adventure may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a *common enterprise for their mutual benefits*...." *Aiken Mills v. United States*, 144 F.2d 23, 25 (4th Cir. 1944) (emphasis added). *Accord, Spradley v. Houser*, 247 S.C. 208, 146 S.E.2d 621 (1966); *Gordan v. Rothberg*, 213 S.C. 492, 50 S.E.2d 202 (1948).

The leading Fourth Circuit case on joint venture is *Rowe v. Brooks, supra.* In *Rowe*, the court found a joint venture where there was an agreement (oral) between parties to the venture, the planned venture was for mutual advantage and profit, each party to the venture was to have a measure of control over and responsibility for the enterprise, and harm was caused by activities within the scope of the enterprise. *Id.* at 39.

Applying the *Rowe* analysis to the instant case, this court finds a joint venture between COCC and McClure. Here, COCC entered into a venture with McClure in 1973 to reclaim and recycle chemical waste products. A written contract confirming the relationship was signed by the parties in July of 1974. Pursuant to their agreement, McClure solicited recyclable or reclaimable wastes from generators and COCC had the right to approve or veto transactions proposed by McClure. Moreover, COCC provided office space and secretarial service to McClure, and each party received 50% of the net profits. As a result of their venture, chemical wastes containing hazardous substances were deposited at the Bluff Road property. Under *Rowe*, COCC is vicariously liable for acts taken by McClure within the scope of their joint venture, including storing and disposing of chemical wastes at the Bluff Road facility, and is therefore liable under Section 107(a)(2) as an "operator" of the facility.

3. *COCC is a person who arranged for disposal or treatment of its hazardous substances at a facility owned or operated by another.*

In its February 23, 1984 order, this court held that the government's burden of proof under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), is basically two-fold. It must show (1) that a person arranged for disposal or treatment of hazardous substances at a facility owned or operated by another, and (2) that the facility in question contained that generator's substances or substances of the same type as that generator's. See also *United States v. Wade*, 577 F.Supp. 1326, 1332 (E.D.Pa.1983).

At trial, Dr. Svoboda, a vice president of COCC in charge of production, admitted that COCC generated wastewater containing such substances as methyl iodide, a volatile organic chemical and a hazardous substance under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), and that COCC contracted with SCRDI for disposal of these wastes. McClure confirmed these disposal transactions, testifying that SCRDI disposed of COCC's wastes at the Bluff Road site during the period of time following termination of COCC's primary leasehold interest in 1978. McClure added that on occasion during this time frame COCC transported the wastes to the Bluff Road site itself, where it would dump the materials. Thus, COCC clearly arranged for disposal of a hazardous substance at the Bluff Road site at a time during which the facility was owned and operated by persons other than itself. Moreover, McClure's unrebutted testimony was that COCC wastes were not removed from the site prior to the cleanup. Thus, the site contained such hazardous substances as COCC's. Accordingly, COCC is liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

4. *COCC was a transporter of hazardous substances to the Bluff Road site.*

To establish transporter liability under Section 107(a)(4) of CERCLA, the government must prove that a person accepted hazardous substances for transport to a disposal or treatment facility selected by that person. 42 U.S.C. § 9607(a)(4). As stated above, the evidence shows that in 1974 COCC cleaned up a hazardous waste dump in Clover, South Carolina. COCC trucks and personnel were used to remove chemical wastes from the site, and COCC transported four to five truckloads of the Clover wastes to the Bluff Road site. McClure testified that the wastes transported to Bluff Road contained such substances as acetic acid and butyric acid, which are hazardous substances under CERCLA. Apart from the Clover cleanup, it is clear that during the years 1974 to 1976 COCC trucks and personnel were used to pick up hazardous substances from waste generators, including Allied Corporation, General Electric Company, and Arapahoe Chemicals, Inc., and transport such substances to the Bluff Road site. Clearly, then, COCC was a person who accepted hazardous substances for transport to the Bluff Road facility. Furthermore, because McClure directed and supervised these op-

erations, and his acts are imputable to COCC under the alternative theories of *respondeat superior* or joint venture, COCC participated in the selection of Bluff Road as the site for disposal of hazardous substances. Therefore, COCC is liable as a transporter under Section 107(a)(4).

### 5. *COCC's liability is joint and several.*

In its February 23, 1984 order, this court concluded that in circumstances of indivisible injury, liability under CERCLA is joint and several, and that the burden of proving divisibility appropriately rests with CERCLA defendants. Order at 15. *See United States v. Chem-Dyne,* 572 F.Supp. 802, 811 (S.D.Ohio 1983); *United States v. Wade, supra,* at 1337–1338. In the course of granting plaintiff's partial summary judgment motions against the other defendants in this case, this court concluded that the harm at the Bluff Road site was indivisible. Order at 15.

COCC has not presented any evidence that would cause this court to conclude otherwise. Indeed, the evidence in the record supports the conclusion that the harm at the Bluff Road site was indivisible. There were thousands of corroded, leaking drums at the site not segregated by source or waste type. Unknown, incompatible materials comingled to cause fires, fumes, and explosions. Because of the constant threat of further fires, explosions, and other reactions, all of the materials at the site were, if not actually oozing out, in danger of being released. It is simply impossible to divide this environmental hazard in any meaningful way among waste generators, transporters, site owners, and site operators. Thus, based on the evidence in the record, this court concludes that the harm at the Bluff Road site was indivisible and that COCC is therefore jointly and severally liable for costs associated with the site.

### CONCLUSION

COCC falls within several of the classes of persons identified in Section 107(a) of CERCLA as liable for response costs associated with the Bluff Road site. Specifically, the company is liable as both an owner and an operator under Section 107(a)(2), as a person who arranged for disposal of its hazardous substances under Section 107(a)(3), and as a transporter of hazardous substances under Section 107(a)(4). Because the harm at the site was indivisible, COCC's liability is joint and several. The question of the amount of recovery to which plaintiff is entitled will be resolved in subsequent proceedings.

AND IT IS SO ORDERED.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This action was brought by plaintiff United States pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607, to recover costs of removing hazardous substances from the surface of the Bluff Road site, a hazardous waste site located near Columbia, South Carolina. The State of South Carolina entered the action as plaintiff-intervenor and also seeks to recover costs associated with the Bluff Road site.

On February 21, 1984, this court entered Summary Judgment against all defendants except Columbia Organic Chemical Company ("COCC"), holding the defendants jointly and severally liable for costs incurred by the federal and state governments in cleaning up the Bluff Road site. After a bench trial on the issue of COCC's liability, this court entered an Order on August 28, 1984, finding COCC jointly and severally liable. The Orders of February 21, 1984 and August 28, 1984 did not treat the amount of recovery to which plaintiffs are entitled because the complexity of the cleanup hindered plaintiff's efforts to assemble adequate cost data.

Now before the court are Motions for Summary Judgment filed by plaintiff and plaintiff-intervenor as well as Cross-Motions for Summary Judgment filed by defendants Monsanto Company, Allied Corporation, Aquair Corporation, and EM In-

dustries, Inc. on the issue of the recovery available under CERCLA.[1] Defendants argue that the court should limit the plaintiffs' recovery to $424,000.00, representing the difference between the $519,000.00 paid by the government to the contractor which performed the cleanup of the site and the $95,000.00 received in settlement from former defendant Eaton Corporation.[2] The government contends that, in addition to amounts paid to the cleanup contractor, discounted by the Eaton settlement, it is entitled under CERCLA to recover administrative, investigative, and legal costs associated with the cleanup and this litigation. Plaintiffs also urge that the government is entitled to prejudgment interest.

In the main, this court finds plaintiffs' legal arguments persuasive and, therefore, denies defendants' motions. Moreover, reviewing the record in a light most favorable to defendants, this court concludes that there are no material issues of fact in dispute with respect to the amount of costs incurred, and that, therefore, Summary Judgment should be granted in plaintiffs' favor on the issue of costs. For reasons noted later in this Order, the court concludes that the facts of this case do not warrant the imposition of pre-judgment interest.

**BACKGROUND**

In June of 1984, before filing its Motion for Summary Judgment, the United States delivered to each defendant a detailed summary of the United States' costs relating to the Bluff Road cleanup. Defendants were informed that the documents underlying the summary were voluminous but would be made available for inspection upon request by defendants, and that the United States would consider any corrections, modifications, or comments that defendants might have in determining the final cost figure for the Bluff Road cleanup. In August of 1984, the United States, having received no requests, challenges, or comments from defendants relating to the cost summary, filed for Summary Judgment on the issue of costs. Attached to the United States' Motion was the cost summary delivered to defendants for comment.

■ At a hearing on August 28, 1984, the United States supplemented its Motion with affidavits of record custodians from both the United States Environmental Protection Agency and the United States Department of Justice. Over objection by defendants, the court received the United States' cost summary and supporting affidavits as evidence.[3] The South Carolina Department of Health and Environmental

---

1. COCC joined in these defendants' Motion after it was filed.

2. Defendants mischaracterize the relief in question as "damages." The term "damages" is ordinarily associated with legal remedies. Not only does § 107(a) of CERCLA refer to "costs" rather than "damages", but the type of relief authorized by the statute is equitable restitution—a remedy designed to return plaintiffs to the financial position they were in before incurring cleanup costs. *See Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *United States v. Long,* 537 F.2d 1151, 1153–54 (4th Cir.1975), *cert. denied,* 429 U.S. 871, 97 S.Ct. 185, 50 L.Ed.2d 151 (1976). *See also United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. 823 (W.D.Mo.1984).

3. In this court's view, the cost documents which underlie the government's cost summary are records of regularly conducted activity, which are subject to the hearsay exception provided by

Fed.R.Evid. 803(6). The Federal Rules recognize the utility and admissibility of evidence summaries in circumstances such as this:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006. Pursuant to Rule 1006, summaries of evidence should be admissible whenever the underlying evidence would itself be admissible. *See Ford Motor Co. v. Auto Supply Co., Inc.,* 661 F.2d 1171 (8th Cir.1981); *United States v. Foley,* 598 F.2d 1323 (4th Cir.1979); *United States v. Consolidated Edison Co., Inc.,* 580 F.2d 1122 (2nd Cir.1978). Because plaintiff's cost exhibit summarizes admissible documentary evidence and was properly authenticated by custodial affidavits, the summary and affidavits were admitted as evidence.

Control ("the State") also sought payment of administrative expenses associated with the Bluff Road cleanup.[4] The court granted defendants an additional sixty (60) days in which to conduct discovery of plaintiffs' underlying cost information for the purpose of identifying issues of fact. Defendants were given fifteen (15) days after expiration of the discovery period to bring any issues of fact to the court's attention. Although the court is aware that some limited discovery was undertaken by defendants, defendants have not filed papers with the court showing a disputed issue of material fact within the requisite time frame.

Thus, in the absence of a showing of disputed issue of material fact, the court accepts plaintiffs' statement of costs incurred as true and accurate.

The United States initially stated costs of $1,157,242.89 in its cost summary. In papers subsequently filed with the court, the United States adjusted that figure, reducing an amount that had been overstated in the summary, calculating in an amount listed in the summary as committed but not yet paid, which was subsequently paid, and reducing the total by the amount received in settlement from Eaton Corporation. The United States' adjusted cost figure is $1,065,910.92.[5] This figure represents the cost of the cleanup itself, as well as administrative, investigative, and legal expenses associated with the cleanup and recovery of the federal government's costs. The State claims an additional $93,000 in administrative expenses which were not reimbursed by the federal government. Because the court accepts these cost figures as true, the only inquiry remaining is whether the government is entitled, as a matter of law, to recover all of these costs.

**4.** The State followed up its demand at the hearing with a Motion for Summary Judgment filed September 18, 1984.

**5.** The figure does not include some expenses which are as yet incalculable. Specifically, the degree to which the federal and state governments will reimburse the cleanup contractor for cost overruns has not yet been resolved, and the

## SCOPE OF RECOVERY

Persons held liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), are responsible for *"all costs of removal or remedial action* incurred ... *not inconsistent with* the national contingency plan ["NCP"] ..." (Emphasis added). The statute limits the grounds for contesting government costs to the issue of consistency with the NCP, and places the burden of proof with respect to that issue on defendants. A recent decision in *United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* ("NEPACCO"), 579 F.Supp. 823 (W.D.Mo.1984), is persuasive in this regard:

> Defendants argue that the plaintiff failed to prove that the costs incurred were reasonable and "not inconsistent with the national contingency plan." Initially, the Court finds that the burden of proving inconsistency with the national contingency plan was that of the defendants. This conclusion is evident from the language of the statute. To give meaning to every term in the statute, the Court reads the insertion of the word "not" immediately prior to "inconsistent" to mean that the defendants are presumed liable for all response costs incurred *unless* they can overcome this presumption by presenting evidence of inconsistency. The content of section 107(a)(4)(B) lends support to this conclusion in stating that responsible parties are liable for "any other costs of response incurred by any other person *consistent with* the national contingency plan...." (emphasis added). On its face, section 107(a)(4)(B) intends that a different standard apply to cost recovery by nongovernmental entities and that such entities must affirmatively show that their actions were consistent....

amount of administrative expense incurred by the State and reimbursed by EPA has not been calculated. Moreover, federal administrative and legal costs which have accrued from March of 1984, the date of the United States' last computations, up until the date of this judgment have not yet been calculated.

Congress had already made provision for the reasonableness of actions taken by the government.... Reasonableness is conclusively presumed to have been built into the plan.... As long as the actions taken by the government were in harmony with the national contingency plan, the costs incurred pursuant to those actions are presumed to be reasonable and therefore recoverable. If Congress had intended otherwise, they would have merely stated in section 107(a)(4)(A), "all reasonable costs," instead of the present language of "all costs."

*Id.* at 850–51. In this case, defendants have failed to prove that any of plaintiffs' costs were inconsistent with the NCP and have not identified any issue of fact with respect to those costs. Consequently, all costs within the scope of recovery under Section 107(a) of CERCLA will be allowed.

■ In *NEPACCO,* the Honorable Russell G. Clark concluded that CERCLA specifically allows for the recovery of all litigation costs, including attorney fees, and administrative and investigative costs associated with cleanups. *Id.* at 851–52. While this court is not without some misgivings about awarding attorney fees to the government for the services of its own lawyers, the broad language of the statute and the cogency of Judge Clark's comments in the *NEPACCO* opinion are persuasive. As noted above, under Section 107(a) of CERCLA, responsible parties are liable for "all costs of removal or remedial action...." 42 U.S.C. § 9607(a). "Remove" or "removal" is defined by Section 101(23) of CERCLA to include "action taken under Section 9604(b)...." 42 U.S.C. § 9601(23). That provision, in turn, provides, in pertinent part, as follows:

Whenever the President is authorized to act pursuant to subsection (a) of this section ... [he] may undertake such *planning, legal,* fiscal, economic, engineering, architectural, and *other studies or investigations* as he may deem necessary or appropriate *to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.*

42 U.S.C. § 9604(b) (emphasis added). Because the response actions at the Bluff Road site were taken pursuant to Section 104(a) of CERCLA, this court concludes that all costs associated with the cleanup and this litigation are recoverable.

■ Plaintiffs seek an award of prejudgment interest on these amounts. The parties agree that CERCLA does not specifically address the issue of prejudgment interest. In the absence of express statutory provision, the question must be resolved by the courts. This court recognizes that some CERCLA actions may present circumstances in which an award of prejudgment interest is appropriate. *See NEPACCO,* 579 F.Supp. at 852. In this case, however, there is no indication that the defendants have been recalcitrant, deceptive or unreasonable. Moreover, defendants have not sought to delay either the cleanup activities or the progress of this case. Under such circumstances, this court declines to award prejudgment interest.

Accordingly, defendants are hereby adjudged liable, jointly and severally, to the United States in the amount of $1,065,-910.92 and to the State in the amount of $93,000.00. The court understands that certain additional costs are as yet incalculable, and, therefore, grants plaintiffs sixty (60) days to file and serve affidavits supplementing the amount of the judgments entered hereby. Defendants are directed to file any opposing affidavits or other evidence concerning such additional costs within 30 days after plaintiff's affidavits are filed.

AND IT IS SO ORDERED.[6]

---

**6.** It is noted that this court has withheld executing and filing this Order for a considerable period of time awaiting the Eighth Circuit Court of Appeals' decision in *United States v. Northeastern Pharmaceutical and Chemical Company,* *Inc.,* 579 F.Supp. 823 (W.D.Mo.1984) inasmuch as the court had received information that this case had been duly appealed to the Eighth Circuit. Since the Eighth Circuit has not at this time issued its Order in that case, the court has

## ORDER OF DISMISSAL OF DEFENDANT COLUMBIA ORGANIC CHEMICAL COMPANY

Upon consideration by this Court of the Joint Motion of Plaintiff, the United States of America, Plaintiff-Intervenor, the State of South Carolina, and Defendant, Columbia Organic Chemical Company ("COCC"), to dismiss COCC from the lawsuit in settlement of claims for the amount of $15,000 it is hereby

ORDERED that the claims as to surface cleanup response costs at the Bluff Road site against COCC are hereby dismissed with prejudice. It is further

ORDERED that the dismissal of COCC shall not affect any other liability or affect the dismissal of any other defendant or other persons in this matter. It is further

ORDERED that Plaintiffs' rights and claims in this matter, as these relate to any other party to the lawsuit, are not affected other than to reduce the total sums due to Plaintiff by the amount of $15,000 as stipulated herein.

## ORDER ON THIRD–PARTY CLAIM

This matter comes before the court on the Motion of third-party defendants, G.D. Searle & Co., and Will Ross, Inc., for Summary Judgment against third-party plaintiff, E.M. Industries, Inc. On May 7, 1985, the court held a hearing on this Motion. Final disposition of this Motion was held in abeyance pending an anticipated appellate decision on a case which provided persuasive precedent for certain damages issues involved in the underlying claim of the original Complaint. Because this court recently entered an Order on the issue of damages, disposition of this third-party Summary Judgment Motion is now timely.

## BACKGROUND

The principal claim of the original Complaint in this action arises from the deposit of chemical wastes by South Carolina Recycling and Disposal, Inc. ("SCRDI") at the Bluff Road site, Columbia, South Carolina.

Defendant third-party plaintiff EMI was sued by the United States under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, for deliveries of waste material by EMI's MC/B facility, an Ohio chemical manufacturing plant. The waste material was ultimately deposited at the Bluff Road site.

The third-party action arises by virtue of the sale of MC/B by Will Ross, a subsidiary of Searle, to Merck AG and its subsidiary EMI. EMI has contended that Will Ross and Searle should indemnify EMI for amounts for which EMI may be held liable for the clean-up at the Bluff Road site. However, because the agreement of sale clearly states that EMI assumed all liabilities of MC/B, such costs are the responsibility of EMI. Accordingly, the court concludes that summary judgment on the third-party claim in favor of Searle and Will Ross is appropriate.

## FINDINGS OF FACT

1. Adolf Haasen, president of EMI, first contacted the sellers concerning the possible purchase of MC/B in late 1976. Negotiations progressed to the point of an inspection of MC/B's Norwood, Ohio, manufacturing plant in April of 1977. On April 7, 1977, Haasen, accompanied by two technical people, one of whom was a Mr. Weissbach, toured the Norwood facility. Weissbach reported to Haasen what he had observed at the plant, including the chemicals MC/B manufactured, the manufacturing facility, and MC/B's disposal of chemical waste. Weissbach reported that "MC/B was using waste haulers to haul off the waste that could not be disposed of with the municipal sewer district." Weissbach reported to Haasen that waste to be disposed of off-site "would be hauled away, for example to South Carolina."

2. MC/B first entered a contract with SCRDI for off-site waste disposal on January 18, 1977. That contract was entered into for MC/B by Michael Mulligan, Vice

decided to go forward and execute and file the within Order.

President of Operations, a position he holds for EM Science, the successor name for MC/B. On April 4, 1977, SCRDI picked up the first shipment of chemical waste from MC/B.

3. On May 5, 1977, a memorandum of understanding was signed indicating an intention by EMI to purchase MC/B from Will Ross. MC/B made two other chemical waste shipments to SCRDI (May 27 and June 17) before the actual sales agreement was signed. On June 14, Mulligan wrote directly to EMI specifying that SCRDI was under contract with MC/B for the disposal of chemical waste.

4. On July 12, 1977, the parties signed the contract document by which MC/B was sold to EMI. A further shipment to SCRDI occurred on August 11, 1977, and the sale was closed on September 1, 1977. That contract provided, in pertinent part, that:

> Subject to the exceptions and exclusions of this Agreement, Buyers agree that on the Closing Date EM will assume and agree to perform and pay when due all the debts, liabilities, obligations, and contracts relating to the business of MC/B of whatever kind, character or description, whether or otherwise, existing or arising on or after April 30, 1977, which Sellers would be bound or obligated to pay. Buyers nonetheless reserve the right to contest, settle or refuse to satisfy any such debt, liability, obligation or contract for reasonable cause but shall, subject to Paragraph 1.5 of this Agreement indemnify and hold Sellers harmless against payment or performance on the part of Sellers of any said debts, liabilities, obligations, or contracts including reasonable legal fees and expenses.

5. Since EMI has owned MC/B, nine further shipments of waste have been made to SCRDI. EMI has entered into identical offsite waste disposal contracts with SCRDI in 1978 and 1979. As far as Mulligan was aware, MC/B was disposing of its waste in a lawful manner. Adolf Haasen, President of EMI, testified that he has no evidence that as of either July 12, 1977 (the date of the agreement of sale) or September 1, 1977 (the closing date) that MC/B was in violation of any statute, ordinance or regulation dealing with offsite waste disposal. Similarly, Roger Bipes, Chief Engineer for MC/B (a position he held for EM Science until 1982 when he became assistant site manager) testified that as of the date of the contract agreement, he was aware of no violations of any laws, regulations, or ordinances dealing with off-site disposal.

6. EMI was sued by the United States in 1980 for various clean-up costs at the Bluff Road site in Columbia, South Carolina. Neither Searle nor Will Ross have been named as defendants by the government.

7. Defendant third-party plaintiff EMI has argued that the entire MC/B acquisition agreement was tainted by allegedly fraudulent representations relating to the *on-site* waste disposal at the Norwood, Ohio facility of MC/B. Multiple issues, including the contention of fraud relating to undisclosed *on-site* waste disposal were the subject of an action by EMI against Searle/Will Ross in the Southern District of Ohio. Trial of the case resulted in a mistrial, and subsequently the matter was settled by a payment of six million dollars ($6,000,000) by Searle to EMI. The intent of the parties in entering into the settlement was stated as follows:

1. *Intent.* The intent of this Settlement Agreement is to settle *all liability and disputes* among Searle, SMP, EMI and Merck relating to on-site waste disposal activities at the manufacturing facility and real estate generally located at 2909 Highland Avenue, Norwood, Ohio (hereinafter "the 'MC/B' facility"), which is more fully described in Exhibit A attached hereto.

2. *Payments by Searle and SMP.* Searle and SMP agree to pay directly to EMI the total sum of Six Million Dollars ($6,000,000.00) upon execution of this Settlement Agreement.

3. *No Admission of Liability.* By entering into this Settlement Agreement,

the parties hereto do not admit any issue of law or fact nor any liability for any waste disposal practices at the MC/B facility.

4. *Release.* EMI and Merck fully and forever release and discharge Searle, SMP, their subsidiaries, predecessors, successors in interest, assignees, and all officers, directors, agents, employees and representatives of all such entities *from all claims, actions, causes of actions, demands or liability of any kind or nature, asserted or unasserted, direct or indirect, known or unknown, having arisen or to arise in the future, in any way related to or arising from any substances (including, without limitation, chemicals, and hazardous and/or toxic wastes) deposited, spilled, leaked, disposed of, dumped or buried at the MC/B facility* or any contiguous property (such substances being hereinafter collectively referred to as the "buried substances"), including, but not limited to, any liability arising from: (1) the excavation, removal, treatment, transportation, and/or redisposal of such buried substances; (2) any such buried substances (or the residue thereof) which have migrated or will in the future migrate off-site (i.e., off the MC/B facility) via groundwater, surface water, or air; or (3) any on-site waste disposal, storage or treatment activities.

*Settlement Agreement* at 1–2 (Emphasis supplied).

## CONCLUSIONS OF LAW

A. By virtue of paragraph 1.4 of the acquisition agreement, EMI agreed to assume all debts and liabilities of MC/B either existing as of the date of closing, or arising thereafter (subject to exceptions in paragraph 1.5, not relevant in the instant case).[1] This case, therefore, presents a straightforward application of the contract to the liability at issue in this case—the off-site waste disposal at the Bluff Road site.

B. This Motion requires an examination of two primary questions: first, whether the liability in the instant case is one assumed under paragraph 1.4 of the contract, and second, whether the contractual provision therefore applies to bar EMI from seeking indemnification in this case. Since the answer to both questions is in the affirmative, and since no material disputes of fact have been established, summary judgment in favor of Searle and Will Ross is appropriate.

 First, there is simply no doubt that this is a liability assumed by EMI under the acquisition agreement, for the contract provides that Buyers assume *all* liabilities, of whatever kind, whether they existed at the time of the sale, or arose thereafter. It is immaterial whether one views the liability as arising at the time of the shipments (therefore, existing "on" the date of closing) or arising by virtue of the lawsuit (therefore, "after" the closing date) for Buyers assumed liability for both. Similarly immaterial is whether such shipments took place while MC/B was owned by Will Ross or by EMI, for again, liability for such waste disposal was assumed by EMI upon its purchase of MC/B. As already noted, subject to certain exceptions not relevant here, EMI assumed all liabilities of MC/B, including the liability for off-site waste disposal at issue here.

C. EMI's third-party action flies in the fact of the clear language of the acquisi-

---

1. Paragraph 1.5 excludes assumption of any liability, *inter alia,* which constitutes a breach of any covenant, agreement, representation or warranty of Seller under the Agreement. In paragraph 2.12, Sellers warranted that "to Sellers best knowledge, MC/B has not operated in violation of any applicable statute, ordinance, or regulation dealing with ... waste disposal ... and Sellers have received no official notice of any alleged violation of any of the foregoing statutes, ordinances, or regulations ..." As not-ed by the testimony of Haasen, Bipes and Mulligan, no claim is made that Sellers violated such warranty with respect to off-site waste disposal, in that MC/B believed at all times that it was acting in conformance with relevant waste disposal regulations. In fact, the same on-site plant manager who arranged waste shipments to SCRDI prior to the sale authorized waste shipments to SCRDI after the sale of MC/B as well.

tion agreement. As between EMI/Merck and Searle/Will Ross, EMI has assumed liability for the off-site waste disposal at issue here. No reason exists not to apply the clear language of the agreement.

D. EMI's contention that environmental liability is exempted from the indemnity provisions of the sales agreement is without merit as a defense against the present Motion. As reflected in footnote 1, *supra,* paragraph 2.12 of the sales agreement provides in pertinent part as follows:

2.12 *Environmental Laws.* To Sellers' best knowledge, MC/B has not operated in violation of any applicable statute, ordinance or regulation dealing with air pollution, emissions, effluents, waste disposal or environmental control and Sellers have received no official notice of any alleged violation of any of the foregoing statutes, ordinances or regulations, except in all cases for violations which have been corrected prior to the date hereof.

EMI has failed to submit any affidavits or deposition which would create any material issue of fact concerning fraud by indicating Searle's knowledge of violations of environmental statutes or regulations as of the acquisition date. Because Searle's knowledge of such violations is what paragraph 2.12 guarantees against, the absence of any such affidavit is fatal to this aspect of EMI's argument against Summary Judgment.

The court also notes that the express intent of the settlement agreement between EMI and Searle in their Ohio litigation involved settlement of "all liability and disputes among Searle, SMP, EMI and Merck relating to on-site waste disposal activities at the [MC/B facility in Norwood, Ohio]." In this court's view, such broad language precludes EMI's present effort to resurrect the onsite waste disposal issue in their claim of fraud by Searle and Will Ross. Apart from the failure of EMI to support the fraud claim by affidavit, the unambiguous language of the Ohio settlement provides an additional basis for this court's conclusion that no material issues

of fact are presented by EMI's attempt to assert fraud.

E. The Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* implicitly recognizes the viability of such indemnity agreements in § 9607(e)(1), which states that:

Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such an agreement for any liability under this Section.

Thus, CERCLA itself recognizes that as between private parties, liability may be dealt with contractually in such manner as the parties agree. In this case, the parties contractually agreed that any such liability would be the responsibility of the purchaser, EMI.

F. The agreement clearly provides that the liability in this case as between EMI and Searle/Will Ross rests with EMI, and no reason exists why such contractual agreement should not be effective. Thus, in the absence of any properly supported disputes of material fact, Summary Judgment in favor of Searle and Will Ross is hereby granted.

AND IT IS SO ORDERED.

### FINAL ORDER

This action was brought by plaintiff United States of America pursuant to Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607, to recover costs of removing hazardous substances from the surface of the Bluff Road site, a hazardous waste site located near Columbia, South Carolina. The State of South Carolina entered the action as plaintiff-intervenor and also seeks to recover costs associated with the surface removal action at the Bluff Road site.

On November 22, 1985, this Court entered an order adjudging defendants jointly and severally liable to the United States in the amount of $1,065,910.92 and to the State in the amount of $93,000. The Court further granted the plaintiffs sixty (60)

days to file and serve affidavits supplementing the amounts stated in the order. This time was extended to March 10, 1986 by orders dated January 23, 1986 and January 29, 1986.

Plaintiff United States has filed with the Court and served on defendants affidavits and an accounting of the federal government's supplemental costs, amounting to $495,223.63. The final cost figure submitted by the United States is thus $1,561,-134.55. The State filed with the Court and served on defendants an affidavit supplementing the State's costs by $159,489.46, which totals a final figure of $252,489.46.

By the Court's order of November 22, 1985, defendants were granted thirty (30) days after the governments' submissions of the supplemental costs in which defendants could conduct discovery relating to such costs and file opposing affidavits. That time has expired and defendants have not filed any challenge to the supplemented costs. Therefore, these supplemental costs associated with the removal action to clean up the surface of the Bluff Road site, being uncontested, are hereby accepted by the court as correct, appropriate, and recoverable. Accordingly, defendants, having heretofore been adjudged liable, jointly and severally, for the costs of the removal actions at the Bluff Road site, must pay to plaintiff and plaintiff-intervenor the amounts of $1,561,134.55 and $252,489.46 respectively.

The award of costs resolves plaintiffs' claims under Section 107 of CERCLA for removal costs associated with the surface cleanup of the Bluff Road site. There remain before the Court claims for injunctive relief relating to the surface of the site under Section 106 of CERCLA, 42 U.S.C. § 9606, and Section 7003 of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6973. These claims are now moot because the removal actions at the surface have been completed. The Court notes that the original complaint included claims which encompassed potential remedial actions at the site, including action associated with sub-surface and groundwater contamination. Because studies were needed to determine the need for remedial action at and around the site, plaintiff and plaintiff-intervenor moved the Court in 1982 to limit the instant claims to costs incurred as a result of removal actions addressing the site's surface, reserving their rights to make further amendments, such as expanding their claims to address site remedial action. This Court sanctioned that approach by entering an order dated August 4, 1982 granting plaintiff's unopposed motion to file the Second Amended and Supplemental Complaint and expressly reserved the plaintiff's and plaintiff-intervenor's rights to make further amendments. Now that litigation of the claims relating to the surface removal actions at the site has concluded, this Court determines that it is appropriate for the plaintiff and plaintiff-intervenor to bring any claims relating to remedial actions in a subsequent civil action. This approach will allow the Court to remove this case from the docket in the interest of judicial economy. Defendants will not be prejudiced if claims for remedial action are litigated in a separate action rather than by way of an amendment to the complaint in the instant case. Furthermore, allowing separate litigation of these claims is consistent with CERCLA's objective of assuring prompt replenishment of the Fund established by CERCLA for use at other hazardous waste sites.

Therefore, this Order is final only with respect to claims for the costs of surface removal actions at the Bluff Road site, and shall be without prejudice to any claims associated with or related to remedial actions at the site.

IT IS SO ORDERED.